Our next case is Luca McDermott Catena Gift Trust v. Fructuoso-Hobbs, 2023-13-83 What do we have on the line, Mr. Knutson, is it? Yes sir. Good morning, Your Honors. Kit Knutson from Cummins, Knutson & Cho representing the McDermott Catena Limited Family Trust. We're all owners of 21.6% interest in the Paul Hobbs Winery Limited Partnership, which in turn is the exclusive owner of the Paul Hobbs trademark. We only have one appellant, the Luca McDermott one. What about the other trusts that make up collectively the 21.6% share in the company? Your Honor, I'm not sure why you only have one appellant, but I represent all three and they are formally the 21.6% interest was owned by their parents and these are minor children and that interest was transferred to the three, but the principles apply to all three equally. It was just an estate planning function that divided them into the three trusts. Are your clients involved in the winemaking business? My clients are involved in the winemaking business. Are they invested? Yes. The parents, Laura Catena, is in fact a winemaker in Argentina and they own the Catena Winery, which has been described as the Mondavi of Argentina. They make Malbec wine, so they're quite heavily involved in winemaking. They're also part of the management of the Paul Hobbs Winery to the extent that their signature is required whenever Paul Hobbs wines are, whenever the use of the Paul Hobbs trademark is being granted for third parties. So they're involved in this winery and they're also very much involved in the winemaking business. But the board found that they either own the mark or use the mark in advertising as a trade name or in any other way where they have developed a trade identity. Correct, Your Honor. So the board has applied a strict standard where a minority shareholder interest in an entity that owns the wine can never have standing unless it has some further proprietary interest in that trademark. And appellants take issue with the fact, based on the precedent, that a minority interest can never have standing, statutory standing. And they also take issue with the fact that the board failed to recognize that there is, in fact, a proprietary interest. Well, in listening to Judge Loehr's question, I agree. I mean, is there a saying here that appellants use the mark, for example? No, Your Honor, but the commercial interest set forth in the two seminal cases, Corkamoo from this court and in Lexmark previously, doesn't require direct use or ownership of a mark to have that commercial interest within the zone of interest under the landmark. I think our case law and Lexmark as well, they're interested in seeing the petitioner engaged in some kind of commercial activity, engaged in commerce, and then gets injured by some kind of unfair competition by someone else. And then that would give them the quote-unquote statutory standing under 1064 to come forward and try to cancel that other company's mark. And here, as I understand it, you are just relying alone on the fact that you have a minority interest in this company that you say is being injured by the existence of these competing trademark registrations. And so that minority interest alone is not you, these trusts, engaged in some sort of commerce, some sort of sales in the marketplace that is being in some way harmed by the existence of these registrations. Yes, Your Honor. So Lexmark and Corkamoo that followed it determined that you need a commercial interest. You don't have to be in the wine business. You have to have something more than an inter-meddler's interest or a consumer's interest, which is the way they described it under the laminate. And in this case, the board has already recognized that shareholders can have derivative interest by virtue of their ownership in the entity that owns the trademark. And there's only a handful of those cases, but those cases have recognized that derivative interest where there is no direct management of the trademark. The issue is can there be harm when there's a threat to the trademark by virtue of that ownership interest. And it's clear that you can have that harm without being directly involved in the management of the winery. But what was overlooked by the board here is that the partnership agreement states that where third-party use, which is what's at issue here, has been approved, then that third-party use has to be approved by my clients. And that was set forth in our opening petition, but I don't think it was fully appreciated by the board. That sounds like a contract claim that you have with Paul Hobbs Winery LP, not whether you have standing under 1064 to bring this cancellation proceeding against these other companies. And that's exactly the interpretation the board had, but there is no dispute in this instance against Paul Hobbs Winery Limited Partnership. The board presumed that Paul Hobbs had approved these two other trademarks, the winery, and the entity has not approved it, and we know that because my clients would have had to sign off on it. In addition, there is no consent in the record that Paul Hobbs has ever approved it. Typically what would happen in a trademark application, especially where there was an office action, raising the Hobbs trademark as a 2D likelihood of confusion, there would have been a consent issued either in the form of a license agreement or some coexistence agreement. And Paul Hobbs Winery is not a party to these proceedings because there's no evidence that Paul Hobbs Winery consented to these two registrations. There's no dispute. Why didn't Paul Hobbs Winery file the petition to cancel these markets? It's an excellent question because the existence of these two other trademarks, utilizing the distinctive Hobbs term within their trademarks, and the extensive marketing claiming to be producing Paul Hobbs wines, jeopardizes the very existence of the Paul Hobbs trademark. One possible theory is because the same attorney of record is representing all three of these unrelated entities, that there is a conflict of interest that prevents them from somehow advising that this is... Or it could be that they just simply don't believe that there's any approximate cause of confusion. But John, in the trademark process, there was an office action that clearly raised the likelihood of confusion. The original Alvarado's Hobbs version was submitted as Hobbs Alvarado's. And the trademark examining attorney raised that issue. The attorney of record responded by proposing that they switch the terms. And so... And then the examining attorney accepted that amendment and withdrew the refusal and allowed the registration to occur. That's correct. So, you know, it was asked and answered. One of the things in the 2D likelihood of confusion office action was they go through what's at issue. And one of the factors they cite is that marketing, the way the product is marketed, is a relevant factor for the purposes of whether there will ultimately be a likelihood of confusion. So in the event that these trademarks, Alvarado's Hobbs and Hillikin Hobbs, were not intending to trade on the goodwill of Paul Hobbs, that would be a relevant response to the objection. But in this case, the record has extensive evidence that the only wines these two wineries produce are wines purporting to be Paul Hobbs wines. Let's get back to the standing question. In the end, we're governed by Lexmark and our own prior president, Post Lexmark, which talks about how a petitioner has to be within the zone of interests that the statute was trying to protect. And, you know, the standard I see is, in particular, the point if the petitioner must allege injury to a commercial interest in reputation or sales. That's the language from Lexmark for a false advertising claim. This case is very similar to that. We have a Minaxi case that also uses that exact same standard, must allege injury to a commercial interest in reputation or sales. Here, your trusts are not engaged in any sales. And nor are they in some kind of business where their business reputation could be injured. And let alone, you haven't alleged that kind of commercial interest injury. So, you know, under our governing precedent, I don't see what we can really do for the trusts here. Your Honor, the board has recognized in several cases, in several different instances, derivative commercial interests by virtue of the ownership. And they've come up in the context of shareholder interest, trade association interest, and in parent subsidiaries where none of those parties has a direct management operation within the winery. But all three of them have derivative rights by virtue of the harm that is presumed on those interests by virtue of an attack on the entity that owns the trademark. Do you have to show more than a presumption of harm? It's a very low standard. First of all, in the Trademark Treatment Appeals Board, there is no right to recover damages at all. So you have to allege harm. And under the 12B6 standard, that allegation is presumed true. And we're not alleging it in a vacuum. It's quite different if these were. In your case, you would have to allege harm that is possibly caused by the confusing notes. Correct. That's absolutely correct. And that's exactly what they've alleged. What is that harm? The harm is that these are without consent of Paul Hobbs. These are classic landmark cases. These are false advertising cases and likelihood of confusion cases where they are trading directly on the goodwill of Paul Hobbs without consent. If there were consent by Paul Hobbs, it would be in the principal register. But still what? Has there been a decline in the value of the company? Maybe the company is making money as a result of this, of the assignment. There's no way that the Paul Hobbs winery would be making money from a third party, the unaffiliated third party's use of its trademark. Are they unaffiliated? Absolutely. I saw somewhere that Paul Hobbs Winery has some ownership interest in these other two wineries. Your Honor, that was a statement made without any evidence at a 12B6 stage of these proceedings. We haven't seen any evidence of that. If there were consent, it would be in the record. It's what the examining attorney's office actually was asking for. There's a likelihood of confusion here. There is, during that application process, you are asked to identify whether there is any other interested party in the marks. Where they raise specifically the Paul Hobbs mark and you have the same attorney of record, there is knowledge on the part of that attorney of record what the marketing plan is intended for. Counsel, you're well into your rebuttal time. You can continue or save it. Your Honor, I'll save it. Thank you. We'll give you three minutes of rebuttal. Mr. Heine. Good morning, Your Honors. I'm here to please the Court. Justin D. Heine of Karl Mackey Power & Ross, on behalf of the appellees, Fructuoso Hobbs SL, and Hillican Hobbs Estate LLC. Your Honors, the appellees respectfully request that this Court dismiss the appeal for lack of Article III standing. Alternatively, we respectfully ask the Court to affirm the opinion of the Trademark and Trial Appeal Board and dismiss petitions to cancel for lack of statutory standing and or a failure to state a claim. As Your Honors have pointed out in the questioning of my colleague, the appellant can't show any concrete, particularized injury traceable to the appellee's trademarks. That failing goes hand-in-hand with the other issue that you pointed out, which is that they solely possess a minority interest in a third-party entity that owns the at-issue mark. Would you say Article III standing is a lower bar than statutory standing? It's an interesting question, Your Honor. I would say it's a higher standard, to be completely honest. It goes to the injury in fact aspect. There has to be an actual, concrete, specified injury that's being caused to the appellant to come before this Court and seek redress. And here, in the record, we have no specified, concrete, particularized injury as to the petition, the appellant. I guess it depends on the statute, right, in a given case, and the interests that the statute is designed to protect, the statutes that are being invoked by the petitioner. Sometimes a statute can say, any person can petition to cancel something. Okay, that's a pretty low bar. It's the lowest of all. And then others might have some other standard for a party who is entitled to challenge something, some kind of federal action. And in that case, it could well be that the standard is actually a higher standard, more rigorous standard, than Article III standard. I completely agree, Your Honor. I think in this particular case, when it comes to the harm, I think the harm standard at the Article III stage is a higher standard than the statutory cause of action standard for this particular likelihood of confusion or fraud on the board claim that's being made by the appellant. But I think it does go to, your point goes to the zone of interest standard that's set for these types of causes of action. And that's on the statutory side. And I think that that is also an aspect that's lacking for the appellants. I don't believe that they meet the standard for the zone of interest, solely by having a minority interest in the entity that controls the underlying trademark. The record, Appendix 17, I believe, paragraphs 14 through 17, they all speak to harm that is specified as to a non-party, the third party, the owner of the actual trademark. They don't specify any harm that's being caused to the appellant. I think that my colleague undersells the need for there to be a commercial use in the zone of interest by the appellant. There has to be a, I believe the standard is a legitimate commercial interest in the mark. And the reason why is because of this idea that we don't want parties to be coming before the TTAB, coming before your honors, that don't actually have a legitimate interest in the mark, that don't have a legitimate use, that don't have actual harm. We don't want that standard to be so low to let intermediaries or self-appointed guardians of the purity of the register be here before the court. And that's a quote from Selva and Sons, Inc., 705. Does the legitimate interest have to be a commercial interest? It has to be connected to a commercial use, your honor. Yes. That's the zone of interest. How does that square with Corkamore and Lexmark? So Corkamore and Lexmark. Corkamore was quoting the quote that I just made. And Lexmark specifically, the case was decided on false advertising injury to a commercial interest, reputation, or sales. So commercial, specified commercial use of the challenge mark. I guess some of our cases have said if your own trademark application has been denied, that can be grounds for being authorized to file a cancellation petition. Yes, your honor. I mean, I guess the assumption is if you're filing a trademark application, maybe you're using that desired trademark in commerce or you have an intent to use that in commerce. But nevertheless, as a technical matter, you know, if your own trademark application gets denied, that can be good enough. Yes, and I think it goes back to the assumption there, your honor, that there's going to be a commercial use or there already has been a commercial use, and they're now just trying to acquire the trademark rights associated with it. I think one of the decisions that was relied upon down below was Mueller, and I think Mueller was the correct standard here to apply in a case like this, your honors. I think that it is the appropriate case in a number of ways. One, it distinguishes between two different types of claims that could be brought. Mueller was pre-redsmart, right? Yes, your honor. But I wanted to mention Mueller because it was relied upon by the board in its decision in this case, and it was brought up because it kind of dealt with a similar type of fact pattern. It dealt with someone was trying to bring a case maybe individually, maybe as a derivative shareholder, and Mueller just wanted rights of the issue. And it just stated that, no, those are two different types of cases, and one is not even appropriate here before the TTAB. The derivative action is outside of the confines of the authority of the TTAB to even consider. It's a California corporation's code. So it's not really relevant for purposes of looking at a case like this. And then also, it also reinforced the need for particularizing the injury that was being caused to the claimant, also making reference to use or ownership of the mark. And then again, your honors, it just kind of reinforces that standard that we shouldn't be allowing intermeddlers, people that don't actually have harm, that don't actually have a commercial use of the mark, to be bringing these types of actions before the TTAB or before your honors. We need to reach the actual claims, the underlying claims that were brought by my colleague. You'd find that there aren't any. They're both meritless. They both more or less end at this look at the marks that are at issue. And the TTAB looked at the marks and they said they're not substantially similar. They're not identical. There's really no need to go beyond that to look into marketing efforts or declarations or anything along those lines. Once that threshold cannot be met, that ends the discussion. And I think that the TTAB got that right. I think that that's the right standard. They both have the word Hobbs and relate to winemaking. That's correct, your honor. But as the TTAB decided, once the first name, the first word was removed and put to the back end, it reduced the likelihood of confusion. It's where they had no concern. And as Judge Shim pointed out, I mean, that issue was directly looked at by the TTAB, directly addressed, directly decided. And finally, your honors, the TTAB denied leave to amend, and I believe that they did that correctly. I believe that the authority here shows that if you can't possibly cure the underlying deficiency in your claim, which in this case I don't believe the appellant can, there's no reason to grant leave to amend. And with that, your honors, if you have any other questions, I'm more than happy to answer them. Thank you, counsel. We have your case. Thank you. Mr. Knutson has up to three minutes if you need it. Thank you. What Lexmark did is to review all of the circuit court's test for standing, and in many instances made that test easier to satisfy. And Judge Raymond, what you said in quoting Lexmark was, is that the zone of interest test is not especially demanding. The commercial interest is required under Lexmark to fall within the zone of interest. The two cases cited by the board are both pre-Lexmark and both impose standards proprietary interests that were not recognized by Lexmark or Corcomore. And the board itself has recognized that commercial interest derivatively by virtue of shareholders in the AT&T Mobility case and in the BRT Holdings case where the petitioner was a shareholder, albeit a majority shareholder, in a trademark-owning entity or, in the case of BRT, in a common-law trademark-holding entity. And so the commercial interest can be found indirectly, according to the board, and consistent with the Lexmark standard. Would that be factually distinct from this case where you're a minority owner and in that trademark board case you're the majority shareholder and therefore can be presumed to have control of the company? Once you accept, there's no reason to presume that a majority shareholder has absolute control over the operation or management of the trademark. And once you accept a derivative interest in the trademark, to say that 51% a majority shareholder has standing where 49% does not have standing defies logic. If you have an interest in the trademark and you can have a derivative commercial right, then shareholders' interests need to be evaluated and they're not mere intermediaries. Isn't that just the same argument? If the trusts have a 1% share? Your Honor, I think the analysis – Do they have a 1% share? Yeah, it's an excellent question. The analysis would be different. If you had a single share – Would it be different? I think it would be different. Would that stand a lender in that circumstance? I think you have to look at the context. I think these are factual inquiries. In closely held corporations, a 21% interest can be quite a bit more substantial than a single shareholder in Disney, for example. You wouldn't want a single shareholder in Disney trying to determine or police the trademark. But in this context, you have no evidence of consent to use the trademark, and yet all of the wines they make purport to be Paul Hopps wines. The principle of the Lanham Act is to avoid consumer confusion, and there is presently a record where you have three distinct entities, all using the distinctive Hobbs term, without any apparent connection whatsoever. They are owned by different parties, all three of them. And in that context, and especially at a 12B6 stage, there is a presumption plaintiffs are entitled to a presumption that the allegations are true. And in this case, even if something more than a shareholder interest were required, a proprietary interest is what these plaintiffs have because they have the right to control third-party use. And so at minimum, petitioners deserve the right to amend this complaint to try to make it clear to the board that there is a proprietary interest, although... Does it make a difference that this is a closely-held corporation? Yes. If it's a public corporation... Does the reasoning apply to a public corporation? It would be a different analysis in a public corporation because you have potentially hundreds of thousands, if not millions of shares, in a corporation like Disney. In this corporation, 21.6% interest has a value, a significant value, and to the extent the degree of harm is to be considered, there are tens of millions of dollars at stake here. And if there is no connection between... So is zone of interest dependent on extent of involvement? I don't think so, Your Honor. I think zone of interest only requires... That's what you're saying in answering Judge Chiu's questions, that there is some sliding scale of interest that is implicated. That seems to be the way the board has interpreted this. If that test were applied, then these claims would have substantial interest because with three trademarks, with unrelated trademark owners, you have the risk of abandonment. You have the risk that they are not in fact... Counsel, your time has now expired. Thank you, Your Honor. We will take the case on December... Thank you, Your Honor. Your Honor.